Opinion

per curiam,:

This is a congressional reference case. Plaintiff in his petition filed in this court pursuant to the House Resolution which is set out in finding 1, seeks to recover compensation for losses and damages alleged to have been caused by action of the Federal Communications Commission. The Commission first issued to him and his broadcasting company a construction permit relative to a television channel and then later suspended the permit. Subsequently the channel which had been allotted to plaintiff was deleted because of interference problems.
The evidence was taken by Marion T. Bennett, a trial commissioner of this court, who heard the witnesses and examined the documents in the case, and submitted his findings which appear below. We have adopted his findings and in light thereof, a summary of which appears in finding 72, it is quite apparent that plaintiff has neither an equitable nor legal claim against the United States.
This opinion, together with the findings of fact, will be certified to the Congress pursuant to House Resolution 284 of the 83d Congress, 1st Session.
FINDINGS OF FACT
1. House Resolution 284, 83d Congress, 1st Session, provides as follows:
Resolved, That the bill (H. R. 5683) entitled “A bill for the relief of Willard L. Gleeson,” together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the *267 House, at the'earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
2. H. E. 5683, referred to in the foregoing resolution, provided as follows:
Be it enacted, by the, Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Willard L. Gleeson, Eiverside, California, the sum of $306,276.55 expended on channel one and $149,442.82 for damages. The payment of such sums shall be in full settlement of all claims of the said Willard L. Gleeson against the United States for compensation for losses sustained by him as a result of the deletion and removal of television channel number 1 by the United States (pursuant to the action of the World Telecommunications Conference held in 1947 at Atlantic City, New Jersey, and the Federal Communications Commission), after the Commission had granted a permit for the construction of television broadcast station karo and for the operation of such station on such channel, and after substantial expenditures and commitments had been made in reliance upon such permit: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
An earlier bill for the relief of Mr. Gleeson, H. E. 1693, discussed in House Eeport No. 655, 83d Congress, 1st Session, sought a direct appropriation for his benefit in the sum of $149,401.79 in full settlement of all of his claims against the defendent growing out of events hereafter described.
3. Willard L. Gleeson, hereafter referred to as Gleeson or as plaintiff, is an individual residing in Eiverside, California. He was, at the time material here, the president and *268 majority stockholder of the Broadcasting Corporation of America, hereafter referred to as bca, a California corporation with its principal place of business in Riverside. Bca was incorporated on September 17, 1938, and started in business on November 15,1941. Bca first operated a standard am radio station, imto, at Riverside. In 1951 bca filed a petition for reorganization under chapter x of the bankruptcy act. Reorganization attempts failing, bca was adjudicated bankrupt on May 22, 1953, and Fred E. Carr was appointed trustee.
On September 1, 1954, Fred E. Carr, as trustee in bankruptcy for the Estate of Broadcasting Corporation of America, filed a petition in intervention in this case. On September 3, 1957, the court having received notice that the bankruptcy proceedings had been terminated with all assets, including any claim in the present case, returned to the plaintiff herein, the petition in intervention was dismissed.
4. On October 19,1953, Willard Gleeson, individually and as president and principal owner of the Broadcasting Corporation of Annerica, filed suit in the Court of Claims praying judgment for Gleeson’s alleged losses in the sum of $6,178,442.82 and losses to bca in the sum of $6,656,719.37. On August 20,1956, an amended petition was filed in which Fred E. Carr (intervenor), as trustee in bankruptcy 'for the estate of bca, joined with Gleeson in a claim for $13,455,719.37 of which $3,306,276.55 was represented as due the intervenor and the balance to Gleeson. On motion by plaintiff allowed October 21, 1957, the petition was further amended by removing the trustee as a party on the amended petition. The-latter sum was likewise asked in the intervenor’s separate petition.
5. Gleeson had been interested in radio broadcasting since 1922. He held various jobs in the field, such as station manager, announcer, and promoter of network coverage by organizations that employed him. Gleeson suffered bankruptcy in 1933 while engaged in radio work in the San Francisco area. His promotional work in radio had shown him that rural areas were not adequately served by this medium and he organized boa for that purpose in 1938. At about this time he was also thinking about television and looking *269 around for mountain sites in southern California satisfactory for a transmitter station. In 1939 he visited the Du Mont Laboratories in New Jersey and examined their tv equipment.
6. Gleeson testified that for two years he studied mountain sites and surveyed them over a period of approximately nine months. As television operates on frequency modulation, he put an em transmitter on the tops of various mountains and made tests with the signal to determine potential coverage. Eventually, Gleeson determined that Cucamonga Peak, which was approximately 8,911 feet high, was what he was looking for and he planned an antenna for the top which would have extended approximately 200 feet higher. Plaintiff estimates that his time was worth $1,000 per month for nine months in searching for and surveying Cucamonga and that he spent eight or nine thousand dollars in connection therewith. These figures are not supported by the evidence.
7. On October 15, 1941, boa secured a special use permit from the United States Forest Service for “approximately 3 acres of National Forest land in Section 25, T. 2 N., E. 7 W., S. B. B. M., on Cucamonga Peak and a right-of-way from Forest Service truck trail for entrance thereto * * * for the purpose of installing, operating and maintaining an em radio and television station, as licensed by Federal Communications Commission; building an entrance road from Forest Service truck trail and developing a water supply.” This permit cost $8.34 for the period October 6 to December 31, 1941. Thereafter the cost was to be $50 per year until the station was placed on a commercial basis, at which time $200 per year was to be charged. The permit also required boa to begin construction work not later than May 1, 1942, and to complete it within one year from the date of the permit which contained the following additional provisions:
This permit will be re-drawn as to description of areas used when field plans for the use are completed by the permittee. Map and detailed plans of development, in quadruplicate, will be furnished by permittee and approved by the Forest Supervisor before any construction work is started.
*270 There is no evidence that the use permit was ever redrawn upon the basis of any such data submitted to the forest supervisor for approval.
8. On September 20, 1943, the board of directors of bca adopted a resolution reading as follows:
Now that this corporation has available, all the material and equipment necessary to build a 1,000-watt regional broadcast station, Mr. W. L. Gleeson, President of the Broadcasting Corporation of America, is empowered and hereby directed to file with the Federal Communications Commission, an application for a construction permit to erect a 1,000-watt standard broadcast station, at Brawley, California, to give to the people of the Imperial Valley a much needed regional broadcast service.
It was further resolved that the president of this corporation also, when facilities are available, shall file for, secure and build a booster station between the proposed Brawley station and kpRO, of Riverside, in the Indio and Palm Springs area to afford broadcasting services to this area, which has a population of over 25,000 and which does not have satisfactory broadcasting service.
It was further resolved that the president of this corporation shall also file with the Federal Communications Commission, an application for both a Frequency Modulation and a Television Station, to be located on the property of this corporation, on the 8,911-foot Cucamonga Peak in San Bernardino County.
On the following day, September 21, 1943, boa secured a further special use permit from the Forest Service. So far as here material, this permit was identical with the permit described in the preceding finding, except that the date for beginning construction work was specified as March 1, 1944, and completion was required within one year of the date of the permit.
9. Bca employed legal and engineering services and on February 11, 1944, filed with the Federal Communications Commission, hereinafter referred to as the eco, an application (No. B5-PCT-30) for a television broadcast station construction permit. This application was received by the ecc on February 11, 1944, and asked for assignment to boa of channel 3 for a three-kilowatt transmitter. Program- *271 mirip; was proposed to emphasize matters of rural interest. The application reflects a total estimated initial installation cost, “using present or pm buildings,” of $104,500. It stated that prices were not available for an aural transmitter. Estimated cost of operation was $4,000 per month. The $104,500 was proposed to be financed by present corporation owners. The owners were shown to be W. L. Gleeson who held 126 shares of boa stock, E. W. Laisne who held 114, and E. L. Laisne who owned 10 shares. It was anticipated, also, that funds could be raised by selling KM and tv receivers in the prospective service area. The financial qualifications of the applicant were represented to be on file with the kcc in connection with an application for a frequency modulation (km) permit. There is no supporting evidence as to the accuracy of the estimated cost of construction or as to the financial ability of the stockholders to finance the project contemplated. The application contained, among others, the following proviso:
45. The applicant waives any claim to the use of any particular frequency or of the ether as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise, and requests a construction permit in accordance with this application.
10. On February 11,1944, boa filed with the kcc an application for a construction permit for an km station. The financial qualifications of the applicant referred to in the finding above were set forth in a balance sheet attached to that application representing that as of December 31, 1943, the condition of boa was as follows:
ASSETS
Current assets-$8,170. 69
Broadcast investments-15, 801.16
Nonbroadeast invest-ments_ 54, 573. 67
Prepayments_'- 377. 99
78, 926. 51
LIABILITIES
Current liabilities_$9, 311. 04
Long-term debt_ 7, 525. 00
Notes payable to officers and stockholders_ 39, 957. 71
Capital stock_ 25, 000. 00
Earned deficit_ 2, 867. 24
78, 926. 51
11. In the February 11,1944, application of bca to kcc for an km station, it estimated the total construction costs at $16,000 for a 1,000-watt transmitter and $28,000 when a ten-kilowatt transmitter became available. Existing studio *272 equipment was to be used and $2,500 was to be spent for acquiring or constructing buildings. Estimated monthly cost of operation was $1,400 and monthly revenue $1,000. In answer to direction to submit the detailed facts upon which estimates were given in the application, reply was made, “Figures as submitted by Western Electric Company, Building Contractor and our Chief Engineer.” All necessary funds were to be supplied by the three stockholders. These estimates and statements are not supported by any documentary evidence in the record.
The objectives of the em programming were stated in the application and were, generally, to cover the farming area of southern California with programs of interest primarily to the rural area.
12. Upon the recommendation of the Defense Communications Board the eco on April 27, 1942, had issued a memorandum opinion adopting a policy “to grant no application for an authorization involving the use of any material to construct or change the transmitting facilities of any standard, television, facsimile, relay, or high frequency (em) broadcast - station.” On February 23, 1943, the ecc issued a notice to licensees and applicants that it would not dismiss or deny applications which could not qualify for construction permits because of the freeze on construction, but would instead take no action upon such applications at that time. Pursuant to this policy applications for new stations were placed in the pending files of the Commission to await the lifting of the “freeze.” Thus, the applications of boa filed on February 11, 1944, were placed in the pending files and boa was so advised on April 28, 1944.
13. The eco sent out a form letter dated September 7,1945, addressed to boa with reference to its em application. In this letter the ecc requested a current balance sheet of the applicant, a statement with respect to changes of ownership, data about the transmitter site and equipment, program plans and a statement as to whether the application was for a community, metropolitan or rural station. It was indicated that upon receipt of the reply the ecc would consider the application as soon as practicable after October 7, 1945, at *273 which time it might, if satisfied with the application, mate a conditional grant thereof pending receipt of complete engineering data. Upon receipt of such data and when the Commission was satisfied that an applicant was technically qualified, a frequency might be assigned. It was further stated that if sufficient engineering data was already on file “the Commission may issue a construction permit including the assignment of a frequency rather than a conditional grant.”
14. On September 12,1945, boa replied that there had been no change in the information furnished in its pm application. On November 10, 1945, boa supplemented the foregoing statement with the following:
Application is for a rural station to serve (with ultimate maximum power) a large and vastly important “desert” area devoted chiefly to production of citrus fruits, dates, melons, vegetables and other horticultural and agricultural products. This area does not now receive adequate radio broadcast service from any existing station. Incidentally in covering this rural area a portion of the Los Angeles Metropolitan area will necessarily be served also.
On November 17, 1945, boa advised that although its m application requested only one kilowatt of power, it planned to increase to fifty kilowatts as soon as possible and to file an amendment requesting an increase to ten kilowatts as soon as the pending application was approved.
15. The eco, on November 21, 1945, issued new rules and regulations concerning television broadcasting service and adopted a television allocation plan. Under this plan 13 channels were made available to television broadcasting in the vhp (very high frequency) portion of the spectrum, with provision for the sharing of all channels other than channel 6 by other radio services. Only television. channel 1 was designated as a commmiity channel and all other channels were made available for either metropolitan or rural stations. Channels 2, 4, 5, 7, 9, 11, and 13 were allocated to Los Angeles. Channels 3, 6, 8, and 10 were allocated to San Diego. Under the plan there were to be 17 community stations, 11 of which were allocated to channel 1.
*274 IS. The rules governing television broadcast stations, referred to in the finding above, specifically defined the various types of stations as follows:
§3.603. Qonrnmnity stations. — (a) A community station is designed primarily for rendering. service. to the smaller metropolitan districts or principal cities. Television channel No. 1 is assigned exclusively for Community stations. Channels 2 to 13, inclusive, can also be used for Community stations provided such use complies with Section 3.606.
(b) The power of a Community station may not exceed an effective radiated peak power of 1 kilowatt. The maximum antenna height for such stations shall be 500 feet above the average terrain as determined by methods prescribed in the Standards of Good Engineering Practice concerning Television Broadcast Stations.
* # * * *
§ 3.604. Metropolitan stations. — Metropolitan stations may be assigned to television channels 2 through 13, both inclusive. They are designed primarily to render service to a single metropolitan district or a principal city and to the rural area surrounding such metropolitan district or principal city.
(b) Metropolitan stations are limited to a maximum of 50 kilowatts effective radiated peak power with antenna having a height of 500 feet above the average terrain, as determined by the methods prescribed m Standards of Good Engineering Practice concerning television broadcast stations. Where higher antenna heights are available, they should be used but in such cases the Commission may authorize less than 50 kilowatts effective radiated peak power so that the coverage (within the 5,000 uv/m contour) shall be substantially similar to that which would be provided by 50 kilowatts effective radiated peak power and a 500-foot antenna. Where it is shown that an antenna height of 500 feet is not available, the Commission may authorize the use of a lower height antenna but will not permit an increase in radiated power in excess of 50 kilowatts. The service area of Metropolitan stations will not be protected beyond the 5,000 uv/m contour and such stations will be located in such a manner as to insure, insofar as possible, a maximum of television service to all listeners, whether urban or rural.
*275 §3.605. Rural stations. — (a) Licensees of Metropolitan stations or applicants who desire to qualify as licensees of Rural stations must make a special showing to the Commission that they propose to serve an area more extensive than that served by a Metropolitan station and that the additional area proposed to be served is predominantly rural in character. In addition, a showing must be made that such use of the channel will not cause objectionable interference to other television stations or prevent the assignment of other television stations where there is reasonable evidence of the probability of such station being located in the future.
(b) Channels 2 through 18 are available for assignment to Sural stations. The service area of Sural stations will be determined by the Commission.
^ *{• »í* if*
§ 3.606. Table Showing Allocation of Television Channels to Metrofolitam, Districts in the United States. — (a) The table below sets forth the channels which are available for the areas indicated. The table below will be revised from time to time depending upon the demand for television stations which may exist in the various cities. Where it is desired to use a different channel in any such area, or to use one of the channels in another area conflicting therewith, it must be shown that public interest, convenience, or necessity will be better served thereby than by the allocation set forth in the table.
(b) Only the first 140 metropolitan districts are listed in the table below. Stations in other metropolitan or city areas not listed in the table will not be assigned closer than 150 miles on the same channel or 75 miles on adjacent channels, except upon an adequate showing that public interest, convenience, or necessity would be better served thereby or that by using lower power or by other means equivalent protection is provided.
The table referred to above showed, among others, allocation of channels described in finding 15.
17. On December 20, 1945, the eco advised boa that it had conditionally granted its application for an ffl construction permit, “subject to further review and approval of the engineering and program details of your application.” This grant was for a metropolitan rather than a rural station, but the possibility of a rural assignment was still left open. This procedure was described by the ecc in the following terms:
*276 Under this procedure grantees are enabled to proceed promptly with their preliminary plans for obtaining certain items of equipment, programming and other details necessary to the establishment of their proposed stations. The proposals of each grantee relating to transmitter power and antenna height are still under review, and each will be notified if any further data is necessary in this connection.
18. On February 26, 1946, a certified public accountant made a report to boa after examination of its records for the year ending December 81, 1945. He stated: “The company’s gross operating income for 1945 was $179,567.28 (45.30% over 1944) but operating expenses totalling $166,731.38 (68.85% more than 1944) reduced the net operating income to $12,835.90 (48.32% less than 1944). While a rising gross operating income may be expected in the immediate future as merchandise to be advertised becomes available and new stations are opened, the company is confronted by the very serious problem of costs rising at a greater rate than the corresponding gross income. This is particularly applicable to salary expense. Bonuses, which amounted to about $10,000.00 in 1945, were in part recognition for past years’ services (the basis was $10.00 per month of services rendered except for the $6,000.00 bonus to the president) but, as indicated in the departmental comparisons for 1945 and 1944, the salary ratio to gross operating income increased in most departments. It is not logical to infer that the company reached its peak of volume efficiency in 1944. * * *
“Total technical departmental expenses in 1945 were in about the same proportion to gross operating income as in 1944. Several of the larger money increases are worth noting. Repairs, particularly to buildings and grounds, were overdue and it is to be expected that with availability of men and material further work along these lines will be undertaken. Outside engineering expense includes a $1,288.75 fee paid for an unsuccessful application to increase the power of klpko. Depreciation increases reflect in great part shorter life expectancy for most of the technical equipment due to technological obsolescence.”

*277

19. During the calendar year 1945, boa, as shown by its auditor’s report referred to above, made a net profit on its operation of only $8,547.79 as contrasted with a net profit of $20,631.15 in 1944. The balance sheet as of December 31, 1945, showed boa’s financial position to have been as follows:

Notes to the balance sheet indicate that Mr. Gleeson had further claims against boa for $17,500 which he was not prosecuting at the time pending the conclusion of negotiations with minority stockholders.
In commenting on the audit by way of conclusion the plaintiff’s auditor said: “Conclusions as to the financial posi-
*278 ___140 O. Oís. tion of the company at December 31, 1945, on the basis of the figures * * * can hardly be favorable. The necessity for stockholders to dip into their private resources to supply funds for the company would appear to be a continuing process.” It is found that the financial condition of plaintiff and of boa at this time is not attributable to actions of the defendant with relation to the pending application for a television permit on which defendant had taken no action.
20. On April 11, 1946, bca amended its application for a tv construction permit from channel 3 to channel 4. This action was taken because channel 3 had been allocated to San Diego as stated in finding 15.
21. The ecc issued a public notice on May 17, 1946, which revealed it had on that day granted nine television applications and still had 79 on file. Eight of the pending applications were for the seven channels allocated to Los Angeles. The Commission anticipated it might be possible to grant 46 applications without a hearing if those applications were complete as to satisfactory engineering plans and if the applicants were qualified. One of the cities listed was River - side, California. Boa was soon thereafter notified by the ego that its application was not complete and should be completed by June 26,1946. At the request of boa it was given an extension to July 26,1946.
22. In a letter dated July 22, 1946, boa transmitted to the eco an amendment to its application for a tv construction permit. The amendment was received by the ecc on July 26. In reply to a question as to what channel was requested, the applicant filled in an answer on the form supplied by the eco reading:
Rural channel and frequency to be selected and designated by Commission.
This foregoing statement was the result of a telephone call by an eco engineer to Mr. Gleeson advising him that hearings could be avoided and much time saved if the Commission was permitted to select the channel which might be allocated. This engineer did not promise any channel would be granted for he had no such authority. It was made clear, however, that the applicant desired a “rural” station. The amended application said this, too, and put the eco on notice *279 that while only a one-Mlowatt power was asked for, a much higher power suitable for rural assignment would be sought when equipment for it was available. The plaintiff’s experience with the ecc in changing its radio channels or frequencies led him to believe that if the ecc was going to assign him one he could safely assume it would be appropriate and acceptable. The amended application made no change in the estimated cost of construction. The planned programs were set forth and emphasized service of interest to a rural area. Statements were made in the application that competent personnel would be employed but that “Due to presently existing uncertainties (particularly with reference to time of construction, extent of service and type of program structure which will best serve public interest during initial period of operation) it obviously is impossible at this time to determine with any degree of certainty the number of types of personnel that will be needed.” It was stated that Mr. Gleeson would manage the tv station, that a chief engineer had been hired who would help in selection of other personnel and that the regular office staff, augmented as necessary, would perform the “proposed program service.” The application stated that construction would start 90 days after materials were available and would be completed 180 days thereafter. Plaintiff had not purchased any television transmitting equipment but on June 1, 1946. had executed a “Television Transmitting Equipment Reservation Form” addressed to the Allen B. Du Mont Laboratories, Inc., covering equipment desired at the time. This form contained the following language, in part:
This is a statement of our future purchasing intention and is not a binding contract ... It is our understanding that we shall be assigned a priority rating and that this rating will provide peacetime delivery protection on equipment specified when you again have Government authorization to produce and sell it. At such time, we are to be granted 90 days’ protection on our priority during which time we shall either negotiate a formal purchase contract with you or permit our priority protection to lapse.
Du Mont accepted the reservation form on June 6, 1946, and so advised plaintiff on June 12.
*280 23. The ecc was not satisfied with the information submitted by the plaintiff, especially with respect to plaintiff’s proposed financing of the tv station. On August 28, 1946, the ecc directed a long letter to bca asking for a verified and subscribed reply furnishing data about the construction costs and financing within 30 days or the application would be subject to dismissal for lack of prosecution. To this inquiry the plaintiff replied on September 6, 1946. The ecc was advised by plaintiff that bca was now planning to begin with a station of lower power and cost and for a more limited area than originally contemplated and that no need for additional capital funds was anticipated.
24. In the meantime, plaintiff was continuing to pursue, simultaneously with efforts to get a tv station, an effort to get the ecc to approve his application for an em station. On May 22, 1946, boa supplemented its application (No. B5-PH-188) for an em construction permit by filing with the ecc engineering data as to the estimated coverage of a 50-lcw. em station located on the top of Cucamonga Peak. On August 28, 1946, bca advised the fcc that its em transmitter could not be delivered or expected before early in 1947. Having in mind the severe winter weather conditions on Cucamonga Peak, bca advised that it could not hope to have the equipment installed and on the air until the summer of 1947. However, the first stage 250-watt exciter unit was available from General Electric within 30 days and, if permission could be had, it could be installed temporarily at the Riverside studios of the bca radio station and put into use within 60 days. It was represented that this would be in the public interest and that there were 600 em receiving sets sold in the area and owners thereof were awaiting plaintiff’s programs.
25. On August 30, 1946, the ecc advised bca that it had, as of July 25, 1946, approved certain terms and conditions to be included in a construction permit for the proposed em station but needed further information. This information was supplied on September 18 at which time the request was renewed that bca be permitted to make a temporary installation of the 250-watt unit at its studios. On September 19, 1946, the ecc granted special temporary authoriza *281 tion for operation, to December 17, 1946, of the 250-watt transmitter at the Riverside location. During delivery, however, the transmitter fell off of the truck, was damaged, and it was necessary to seek an extension of the special permit which was extended to March 17, 1947. Various other modifications were made in the permit by the ecc and the Commission was notified by boa that it was ready to go on the air on December 21,1946. In the meantime, the eco on November 19,1946, granted boa a construction permit to erect a three-kilowatt m station on Cucamonga Peak, construction to be commenced by January 19,1947, and finished by July 19,1947.[1]
26. The tv application was running into difficulty with the Commission. Plaintiff’s counsel advised on November 29, 1946, that the proposed site on Cucamonga Peak would enable the station to cover too much territory, whereas its signal should not extend more than 50 miles. Gleeson rebutted this idea in letters to members of the roo insisting that it would not have a coverage greater than given to other southern California stations proposing to use Mount Wilson. Cucamonga Peak was said to be the best location for a station hoping to serve the southern California rural areas.
27. On December 19, 1946, the egg, notwithstanding the provisions of section 3.603 of its rules which reserved channel 1 for community stations, granted boa a construction permit for operation of a rural station (kako) at Riverside on channel 1 with an effective peak power of one kilowatt. The permit specified that the transmitter was to be located on Cucamonga Peak. The permit also specified that it was contingent on caa approval, that the roc might require the permittee to install a directional antenna having characteristics to be specified and that not in excess of 50 watts of effective power was to be radiated in the direction of Ventura, California. The antenna was not to extend above ground more than 264 feet. Construction was required to commence on February 19, 1947, and to be completed by *282 August 19, 1947. The permit contained the following language:
* * * The authority herein contained to conduct tests shall not be construed as a television broadcast station license, but only to make tests incident and necessary to proper construction of the station, and the Commission reserves the right to cancel or modify such authority.
This permit shall be automatically forfeited if the station is not ready for operation within the time specified or within such further time as the Commission may allow unless completion of the station is prevented by causes not under the control of the permittee.
28. On December 20, 1946, the ecc approved applications for construction permits for six tv stations in Los Angeles to operate on channels 4, 5,7, 9,11, and 18 with transmitters on Mount Wilson. Two of the stations planned 4-Mlowatt transmitters, three planned 5-kilowatt transmitters and the sixth a 25-kilowatt transmitter. Action was deferred on the seventh pending Los Angeles application until action was taken on other applications by the same applicant for renewals of certain licenses for am stations. At the time ecc granted the construction permits above and for channel 1 it had begun to receive complaints of interference between existing stations and the various other services sharing television channels. This started an investigation by the eco which culminated in the notice later described in finding 41.
29. Stanley G. Reynolds, chief engineer for bca, prepared a report under date of December 20, 1946, entitled “Station Construction on Mt. Cucamonga.” The purpose of the report was to state the basic and general plans and needs of bca relative to construction of radio and tv facilities on the peak of this mountain and needs for an all-year road and base on the south side. A substantial building program was contemplated by the report. Approximately five men would be required to service and operate the 20 tons of equipment expected to be placed on the site. Housing would be necessary for personnel. Buildings would be necessary for the equipment and supplies. A power plant and water supply were other matters gone into by the report. The south slope of the mountain was very steep and had *283 slide areas but it was concluded that it was superior for a future road because it could be kept open all year whereas the Forest Service trail on the north side was closed by snow for four or five months annually. The report recommended that authority be secured from the Forest Service to establish a road up the south face and a base camp at the junction of this road and the existing forest trail. It was desired that construction should start in the spring and summer of 1947 but anticipated that it might not be completed before the winter of 1948.
30. Plaintiff was greatly concerned about the provision in the construction permit which specified that the egg might require installation of a directional antenna and that not in excess of SO watts of effective power was to be radiated in the direction of Ventura, California. On December 27, 1946, the rcc advised that it was its practice to duplicate stations on channel 1 at separation predicated on assignments of one-kilowatt power at a height of 500 feet above average terrain, hence the condition in the grant. The ncc stated it intended to duplicate channel 1 in the Ventura area when and if such an application was filed. The plaintiff made inquiry and found that no such thing as a directional antenna had been developed by the tv industry. A willingness was expressed to install one when and if available and required. There is no evidence that in fact it was ever ultimately required of plaintiff. On January 23, 1947, the ego advised the Du Mont Laboratories, which had made an inquiry on behalf of boa, as to steps which could be taken as proof of performance of the antenna system which would satisfy the Commission that plaintiff’s proposed tv station was not improperly encroaching on the Ventura territory. There is no record of a protest by boa to the foc on this account.
31. By December 31,1946, boa was in a precarious financial condition. Its auditor’s report showed a net income of $12,609.84, a balance of $2,304.61 and liabilities and assets of $193,046.40. Boa was expanding rapidly and put three new radio stations on the air in 1946. The auditor stated: “A proportionately large number of employees were trained during -the year for new positions. These conditions make *284 it difficult to compare operations with previous years.” The current assets of $40,162.06 included only $1,644.17 in cash and the balance was represented by accounts receivable by the boa radio stations at Riverside, Brawley, San Bernar-dino, and Indio and a small sum representing advances to employees. These stations also accounted for the bulk of fixed assets totaling $144,146.44. The jpm station operating on a temporary license at a temporary location accounted for $14,086.78 in fixed assets of which $586.78 was for construction and the rest for equipment. Mr. Gleeson was still claiming but not prosecuting his claim for $17,500 referred to in finding 19. Bca listed $121,644.84 in current liabilities and a total long-term debt of $153,131.95.[2]
32. Reference was made in finding 22 to the fact that on June 1, 1946, bca had executed a tv transmitting equipment reservation form with Du Mont Laboratories. On January 21, 1947, soon after issuance of the tv construction permit, which was in December 1946, bca gave a binding purchase order to Du Mont for $89,000 worth of equipment subject to the right of Du Mont to adjust to prices in effect at the time of delivery scheduled for December 1947. On some items, quoted at a pi-ice of $71,800, it was agreed that the price could not be increased more than five percent. The order specified that one-third of the total purchase price was to be paid with the purchase order, one-third on the date of shipment and one-third within 30 days after date of shipment. Mr. Gleeson offered to make the payment of the first one-third when the order was given but Du Mont did not accept it. There is no evidence that any payment or delivery was ever made on this order.
33. Bca continued to engage in further planning for tv operations and this planning was intensified after issuance of the construction permit on December 19, 1946. It is im *285 possible to tell from the evidence just how much of this activity was before and how much came after December 19, 1946. However, two 100-kw. generators were ordered, one being delivered in 1950 and later repossessed. Carpenter crews were put to work, employees were transferred within the organization, surveys were made to determine how to transmit programs from Kiverside to the top of Cucamonga Peak, a mule pack trail originally built up the mountain by the Civilian Conservation Corps was reopened, building locations were staked out on top of the mountain, trees there were cut down and brush was cleared away. Tools and surveys cost $1,562.92. What expenses boa or plaintiff incurred for these other things are not established by the evidence. Many, if not all, of these activities were also in the interest of plaintiff’s hi station.
34. The evidence establishes that boa took out five building permits in the years 1941, 1944, and 1945. All of the permits were taken out prior to the issuance of the tv construction permit by ecc in December 1946. One permit, which was paid for on December 27, 1945, would have allowed construction of a building costing approximately $50,000. There is no evidence that such a building was constructed. In fact, an application for a tv permit filed by plaintiff in 1948 represented that if granted plaintiff planned to build “a new specially designed building” for the station in Kiver-side at a location yet to be determined. This is confirmed by a newspaper article quoting plaintiff on March 11, 1948. The permits clearly were for the radio station buildings of bca. There is evidence, however, that commencing about August 1946 and continuing to March 1947, in connection with some radio building construction planned in 1941, boa incorporated therein some features which would be of later value if the eco granted it a tv license. The plaintiff testified that this was done for two reasons. First, it was as a result of conversations with an fcc engineer which gave rise to plaintiff’s belief that he would get a tv license. Second, it was in reliance upon the construction permit of December 1946. This work, however, was stopped by reason of a notice in May 1947 from the ecc, referred to hereafter in *286 finding 37. What such work cost is not proved. Alleged costs are discussed in finding 60 (a).
35. Plaintiff’s amended petition asserts that 36 people[3] were employed after issuance of the construction permit, that these people were in excess of the number needed to operate bca radio stations and would not have been hired for radio work alone, that they were “surplus,” and that the expense of their employment is a proper charge against plaintiff’s xv expenses allegedly arising from defendant’s actions toward plaintiff. It is found that to operate a television station does require more employees than a standard radio station. Plaintiff did employ several people whose talents and services would have been very valuable in event boa had been granted a xv license. The television industry was fairly new in 1946. There were not many stations on the air and there was a very limited pool of people with television experience. Some of them had formal school training in the subject. Others had talent and plaintiff desired to keep them in readiness and to give them training. Further, because bca had gone on the air in 1946 with two new standard am radio stations and with its temporary pm station, additional employees were needed. None of the additional employees were told that they were being hired specifically for xv although a number of them knew about plaintiff’s hopes and plans for xv and also hoped that if a xv station was established they would find employment in it. All of these employees during their employment with bca were employed full time on boa’s broadcast activities other than xv.[4] The finding with reference to the damage feature of this part of plaintiff’s claim is 60 (b).
36. The last reference to plaintiff’s pm station progress was in finding 25. Following a chronological development of plaintiff’s difficulties with xv and pm radio, it is found that on February 18,1947, without notice and four months earlier than expected, the General Electric three-kilowatt transmitter for the pm station was delivered. Due to the season, *287 it could not be put on Cucamonga Peak so plaintiff desired to get it into operation on a temporary site instead of permitting it to remain idle. Plaintiff proposed that it should be installed on Box Springs Mountain near Riverside, the right to do so having been secured by lease at a nominal rent from the owners. Special temporary authority was requested of the fcc to continue interim operation of m station kpoR beyond the expiration date of March 17, 1947, on the new site. This request was granted by the fcc when it extended authority to operate the fm station (kpor) to July 19, 1947. The construction permit for installation also was to expire on the same date.
37. On May 14,1947, the acting chairman of the fcc wrote to bca at Riverside as follows:
In connection with the above television station for which you now hold a construction permit for channel #1, 44 to 50 megacycles, it now appears that some unforeseen allocation problems will be involved that may not be solved until the close of the World Telecommunications Conference at Atlantic City, New Jersey, ending in September or October of this year. The problems involve the frequencies between 44 Me and 216 Me assigned to both television and non-broadcast services.
A possible reduction in the number of channels assigned. to television or a rearrangement of the lower television channels may be involved. It appears that channels #1 and #2 are most likely to be involved. Therefore, it is requested that you withhold further action or construction of Television Station karo until the Commission is able to inform you of further details in this matter.
Boa received the foregoing letter on May 20,1947
38. Bca had been given a completion date of August 19, 1947, for completion of the xv station, when the permit was granted on December 19, 1946. On June 20, 1947, bca sought an extension of this date in view of the information contained in the letter set forth above. Accordingly, the fcc did extend the dates for commencement and completion of construction to August 1,1948, and February 1, 1949, respectively. However, on August 18, 1947, the fcc sent bca a notice that the completion date would be February 1,1948.
39. On June 27, 1947, plaintiff heard from Du Mont Lab *288 oratories which had been given an order for tv equipment, as shown in finding 32, the delivery date being in December 1947. Du Mont advised that it could now make immediate delivery on five-kilowatt tv transmitters, at a price of $69,500 compared to $35,000 for a smaller transmitter included in the order. Plaintiff was in no position to and did not seek to get the larger transmitter.
40. As the time to cease fm operations and construction on July 19,1947, was approaching, plaintiff on June 24,1947, requested a further time extension. The application pointed to difficulties encountered in finishing the fm: installation before the expiration date. The illness of the owner of Box Springs Mountain had delayed the survey and other arrangements, and the power company, because of shortages of labor and materials, was not able to put up a power line. Plaintiff was seeking a diesel-driven electric power plant as a substitute but he had not obtained it. Additional time extensions were given. The station, kfor-fm, began temporary operation on Box Springs Mountain on September 19, 1947, and operated until early in 1952 when it went off the air because of repeated mechanical failures and the inability of boa engineers to operate it within fcc engineering requirements.
41. On August 14,1947, the fcc issued a notice of proposed rule making in the matter of amendments to the Commission’s rules and regulations governing sharing of television channels and assignment of frequencies to television and non-government fixed and mobile services. The notice stated in part :
2. In May and June 1945 the Commission issued its Allocation Report providing in part for 13 television channels and specifying that 12 of those channels be shared with other radio services on a mutually non-interference basis. Since that time the Commission has conducted a comprehensive study of various sharing arrangements. The problems inherent in sharing were also discussed at length at an informal engineering conference held on June 10 and 11, 1947. As a result of these studies the Commission is of the opinion that there is no practicable sharing arrangement which will not cause serious interference to television reception.
*289 4. The salient provisions and objectives of .the proposed changes may be summarized as follows:
(a) All provision for sharing of television channels (except channels 7 and 8) is abolished.
(b) In order to accommodate the non-government fixed and mobile radio services for which provision was formerly made on a shared basis on television channels 1 through 5 and 9 through 18, the assignment of the band 44 to 55 me. is changed from television to non-government fixed and mobile. At the present time there is no television station operating on this channel and there is only one construction permit outstanding. *****
6. Any interested person who is of the opinion that the proposed changes should not be adopted or should not be adopted in the form set forth herein, may file with the Commission, on or before September 15, 1947, a written statement or brief setting forth his comments. If any comments are received which appear to warrant the Commission in holding an oral argument before final action is taken, notice of the time and place of such oral argument will be given at a subsequent date.
Appendix C to this notice was entitled “Eevised Table of Proposed Allocation of Television Channels to Metropolitan Districts.” This showed no change in the allocation of channels to Los Angeles or San Diego. It did show the current allocation to Eiverside of a community station on channel 1, proposed to be changed to a community station on channel 6.
Boa received notice of this proceeding, but after considering the matter did not enter any appearance in it or otherwise participate in the proceedings which ensued.
42. In September 1947 plaintiff attended the annual national convention of broadcasters in Atlantic City, New Jersey. While at the convention he had a conversation with Mr. Charles Denny, chairman of the ecc. Plaintiff expressed concern because his construction permit had been stopped by the ego notice of May 14, 1947, and explained that he had been recruiting personnel and borrowing money to operate a tv station. He wanted to know what was going to happen. Mr. Denny advised him that the eco was legally and morally bound to take care of boa and counseled patience. Mr. Denny resigned from the eco on Oc *290 tober 24, 1947, and was employed by the National Broadcasting Company.
43. Plaintiff learned in October of 1947 that if boa was given channel 6 it would be allowed to put in only a one-kilowatt transmitter which would mean that the station would serve only a very limited local area. There was discussion between an engineer of the fcc and a Du Mont engineer about the possibility that bca might get channel 13, allocated to Los Angeles, but on which apparently little development work had been done by the holder of the construction permit. This information was passed along to Gleeson by the Du Mont engineer. Channel 13 would have had greater power than chaimel 6. Plaintiff, however, concluded at this time that it would be better “to lay our television deal squarely in the lap of the Commission and leave it up to them to solve it for us rather than make a move on our own hook.” Plaintiff was still hoping to get a powerful rural station for operation outside of Los Angeles and on November 5, 1947, wrote to the fcc urging that it make an early and final disposition of the matter. The fcc replied on November 17,1947, noting that plaintiff had not filed an appearance in the proceedings in which it was proposed to allocate channel 6 to Eiverside in lieu of channel 1 and providing him with a copy of the Commission’s notice in Docket 8487.
44. The balance sheet of bca as of December 31, 1947, as determined by its auditors, read as follows:
ASSETS
Cash_ $1, 600. 09
Accounts Receivable_ 42,121. 77
Advances to Employees- 286. 00
Other receivables_ 566. 50
Fixed assets_ 158, 943. 63
Other assets_ 8, 988. 98
212, 506. 97
LIABILITIES
Bank overdraft_ $7, 775. 72
Notes payable_ 46, 259.75
Current portion of long-term debt_ 9,100. 00
Accounts payable_ 48, 843. 48
Accrued expenses_ 10, 249. 26
Long-term debt_ 57, 860. 40
Capital_ 25, 000. 00
Earned surplus_ 7, 418. 36
212, 506. 97
During 1947 bca suffered a net loss of $7,406.09.[5] No explanation of this loss appears in the record, although the auditor’s statement is:
*291 Three new stations went on the air during 1946. During 1947 new facilities were constructed for the pm Station and construction was started for a new station at Blythe. The Corporation has not made equitable distributions of operating expenses to these new stations.
Nothing was set up in the balance sheet with respect to boa’s proposed tv station. The pm installation on Box Springs was included in fixed assets at $19,392.51, with a notation, “Pledged — see contra trust deed notes payable.” In “other assets,” the following appeared: “Cost of engineering affidavit and survey re Cucamonga Peak fm installations to be charged to cost of regular license when issued— $1,564.92.”
45. On January 10, 1948, boa filed an application for an extension of its tv construction permit due to expire on February 1, 1948. It was requested that the Commission waive its rule that such an application be filed at least 30 days prior to the expiration date of the permit. The extension requested was denied on March 25, 1949, for by that time, as will be shown in later findings, channel 1 had been deleted, which had the effect of canceling the construction permit.
46. Boa filed with the ego on March 15, 1948, an application dated March 11, 1948, for assignment to it of tv channel 13, allocated to Los Angeles and previously assigned to Mrs. Dorothy Thackrey. It was stated that boa would install a five-kilowatt eoa transmitter on Cucamonga Peak. The cost of the installation was to be $314,450, made up as follows:[6]
Transmitter including tubes_$84,500
Antenna system and transmission line_ 16,000
Frequency and modulation monitors_ 4,125
Studio technical equipment_ 70, 000
Acquiring or constructing building_ 125,000
Test equipment_ 13,825
Acquiring land_No cost
The foregoing costs were stated to be “information from manufacturer and from survey in proposed service area, *292 and engineering.” There is no other evidence on the estimate. The application recited as to the buildings:
It is planned to construct three new, specially designed buildings at estimated combined cost of $125,000, one each in Riverside (on present site) and San Ber-nardino, and one on Cucamonga Peak. Cost is to be financed by long-term loans secured by mortgages on the buildings.
As to the location of the Riverside studio the application also said “to be determined.”
Under “proposed construction” it was stated that the costs of installation would be financed and paid for by $100,000 in existing capital, $150,000 in new capital and $100,000 in credit. As noted in finding 44, boa had no available funds as of December 31, 1947. However, the application indicated that it was proposed to increase boa capital authorization from $25,000 to $500,000 and sell $250,000 worth of preferred stock to make funds available to defray all costs. Costs of operation for the first year were estimated to be $150,000 with the same for revenue. No hearing was requested on the application.
47. On May 5, 1948, the rcc issued its report and order in the proceeding which had been instituted on August 14, 1947, relating to the sharing of tv channels by other services, and the possible deletion of one tv channel. So far as material, that report provided as follows:
I. Sharing oj Television Channels:
Under the present allocation, all of the television channels except No. 6 are shared with other services. Television channels 1 through 5 and 9 through 13 are shared with nongovernment fixed and mobile services and channels 7 and 8 are shared with government fixed and mobile services. Under the Notice of Proposed Rule Making it was proposed to eliminate sharing on all television channels except 7 and 8. At the opening of the hearing, it was announced that the Interdepartment Radio Advisory Committee had advised the Commission that sharing on channels 7 and 8 could also be deleted if the Commission deleted the sharing requirements on the other television channels.
The evidence introduced at the hearing by both the Commission and private parties showed beyond any doubt that the shared use of television channels was not *293 feasible. Destructive interference would be caused to .television reception over large areas from either fixed or mobile stations operating on the same or adjacent channels. An attempt was made to show that some shared use of these channels would be possible on the basis of an engineered assignment plan. The difficulty with this proposal is that an engineered plan presupposes a freezing of the entire television allocation plan so that it would prove extremely difficult to make any alterations in the plan necessary to meet changing conditions. Moreover, even an engineered assignment plan would not make possible joint use of the same spectrum space in the congested areas where the real need for frequencies is the greatest.
For the foregoing reasons, the Commission is convinced that sharing of all television channels should be abolished.
V
III. Deletion of a Television Channel:
As can be seen, the action of the Commission eliminating shared use of television channels and restricting the use of the band 72 to 76 megacycles to fixed circuits on an engineered basis results in a marked diminution in the number of frequencies available for the fixed and mobile services. In order to provide for the needs of these services, the Commission’s Notice of Proposed Rule Making proposed the deletion of a television channel and its allocation to the fixed and mobile services.
Representatives of the television industry objected to the deletion of one of their channels, but admitted that 12 exclusive television channels were preferable to 13 channels, 12 of which were subject to sharing. As has already been pointed out, the Commission does not believe that sharing is feasible. In order to meet the needs of the other radio services, the Commission is of the opinion that television must surrender a channel so that provision can be made for the needs of those other services which were to have been accommodated in the band 72 to 76 megacycles and on a shared basis in the television channels. The Commission appreciates the fact that this action does make more difficult the establishment of a nationwide television system on frequencies below 300 megacycles. However, the Commission is convinced that, on an overall basis, a generous allocation has been made for broadcasting, including television, and that the needs of the fixed and mobile services cannot be overlooked. The Commission reiterates its opinion as expressed in its May 25,1945, Allocations Report *294 that there is insufficient spectrum space below 300 megacycles to make possible a truly nationwide and competitive television system and that such a system must find its lodging' higher in the spectrum where more space exists.
In the Commission’s Notice of Proposed Eule Making the television channel proposed for deletion was No. 1. At the hearing the American Eadio Eelay League recommended that Channel No. 2 be deleted. The League based this recommendation on the fact that the harmonics of an amateur band and of industrial, scientific and medical devices would fall in Channel No. 2 and largely destroy its usefulness. The League further pointed out that improvements in receiver design can obviate or minimize adjacent channel problems but that no change in receiver design will eliminate the effects of harmonics; the harmonics must be suppressed. The arguments advanced by the League have considerable merit and have been carefully considered. The Commission has concluded that no perfect solution exists. On the whole many of the problems in this portion of the spectrum are the result of the interspersed nature of the frequency allocations. If television channel No. 1 is deleted, channels 2 through 6 are substantially one block. If television channel No. 2 is deleted, and channel No. 1 is retained, there will be boundary problems for two channels; channel No. 1 will have adjacent channel interference on two sides and channel No. 3 will have it on one side. Viewing all factors the Commission finds that a better allocation will result if television channel No. 1 is deleted. Eep-resentatives of the television industry were also of the same opinion.
* * * * *
The public welfare and national security necessitate arriving at an allocation at the earliest possible date for the fixed and mobile services engaged hi safety and protective activities. Hence, it is essential that KM stations dependent upon certain other km stations in the 44-50 me. band as a program relay facility must look to other facilities for program relaying. Therefore, the band 44-50 megacycles is allocated to the fixed and mobile service.^ The specific allocations in this band are set forth in a Notice of Proposed Eule Making adopted today.
On the same day the fcc issued a notice of proposed rule making with respect to an amendment of its rules relating *295 to the allocation of tv channels to cities throughout the country. For California, this showed the following proposed allocation:

Present allocation plan Proposed allocation plan channels channels

California

,_ 8, 12. Bakersfield,
13. Chico_
2, 4, 5. El Centro __
2, 4, 5, 9. Eureka_
2, 4, 5, 7. Fresno_ JsD Ox
2, 4, 5, 7, 9, 11, 13. Los Angeles. O Ox
8, 10. Redding_
. 1_ Riverside. _.
_ 3, 6, 10_ Sacramento. CO Oi M O *
. 3, 6, 8, 10_ San Diego, _ CO -* Oi 00 - i — i o *
- 2, 4, 5, 7, 9, 11... San Francisco, Oakland_ bO ^ ^ ox - <1 ~ o
- 13_ San Jose_ H co
San Luis Obispo CO ♦
Santa Barbara. _ Q ♦
Stockton_
Visalia_
On tibe same day the ecc scheduled a hearing to receive information as to the possibilities of utilization of the frequencies between 475 and 890 megacycles for television broadcasting. These are the channels now known as uhf (ultra high frequency), as contrasted with vhf (very high frequency) which represent the “standard” tv channels.
48. In July of 1948 Mr. Gleeson was concerned about his lack of substantial experience and the lack of it within his organization, relating to corporate fiscal matters and ways and means of negotiating some basis of settlement with troublesome minority stockholders. He was also desirous of raising by some means approximately $800,000 in order to complete expansion and development plans for boa and for em Radio and Television Corporation which he had formed for sale and repair of tv sets and development of tv in northern California. Grants for tv, em and facsimile were described as requiring that the financial structure be placed in order. Gleeson made an agreement with Mr. H. M. Preston, an experienced business consultant, to assist these purposes. He was to receive $10,000 per year for three years and agree *296 ments were to be concluded giving him a substantial stock ownership in the companies. He was also to receive expenses. Mr. Preston did not receive any compensation and it is not established what his services, if any, were to plaintiff. In 1950 plaintiff unsuccessfully sought loans from the Reconstruction Finance Corporation and from the Small Business Administration.
49. On August 1, 1948, the eco extended the time of klac-tv, owned by Dorothy Thackrey, to construct the tv station on channel 13 in Los Angeles. A showing had been made to the Commission that due to no fault of the applicant a transmitter ordered in May 1946 had not arrived but that $189,850.82[7] had been spent on construction and other equipment and that on August 1,1948, estimated total expenditures of $300,000 had been or would be made. Although represented by counsel, plaintiff did not appear at the allocation hearing or file any petition for rehearing in relation to the hxac extension, as he had the right to do. Plaintiff and counsel, however, did protest the extension of the Thackrey permit in correspondence to members of the fcc, to numerous members of Congress and to the Democratic National Committee.
50. In its protesting correspondence plaintiff not only objected to the extension of the Thackrey permit but took strong exception to the fact that Mrs. Thackrey had filed with the fcc applications to transfer control of certain of her broadcasting corporations to Warner Bros. Pictures, Inc., including the construction permit for channel 13. Prices for the various facilities covered by the proposed transfer were not separately stated and the fcc had notified the applicant to furnish it this information. Section 1.321 of the Commission’s rules and regulations provided a procedure whereby other persons desiring to acquire the stations proposed to be transferred could file competing applications and Mr. Gleeson was put on notice that he had a 60-day period within which to take such action. He did not do so. His position was summarized in a letter to the fcc on August 18,1948, which stated, in pai’t:
*297 In our opinion a construction permit of itself is nothing more than a bare conditional authority (gratuitously granted to a specified person) to construct a station, in strict accordance with its terms. Only if and when that is done completely, and satisfactory proof thereof is properly made and submitted to the Commission together with a proper application for station license, in strict compliance with the Eules, does the Permittee acquire a vested right in and to the bare use of the designated frequency or channel. An ownership interest which can be sold is not and never can be thus acquired.
The construction permit of itself is, and can at most be considered only as evidence of authority, a bare privilege, to construct a station. It is of itself of no monetary value whatever, particularly where no expense whatever has been incurred in constructing the station as provided therein. It cannot be considered as tangible property, in any sense, and cannot be sold or transferred under any condition.
In opposing the Thackrey application to transfer the channel 13 permit, plaintiff argued that if this was allowed then plaintiff also had a vested interest in the permit which had been canceled and should be paid just compensation for it. Plaintiff had insisted, in error as now appears, that no funds had been spent under the Thackrey permit.
51. On September 2, 1948, a special use permit for road right-of-way was issued to boa granting it authority to construct a road in a 66-foot right-of-way to the top of Cucamonga Peak. The permit was issued free of charge and contained detailed construction standards. The permit was accepted by plaintiff on December 17, 1948. There is no evidence that any such road was ever built or what it would have cost if built.
52. Boa next filed, on January 6,1949, an informal application to construct and operate a tv station at San Bernardino, using a 1,000-watt Du Mont transmitter and an antenna 300 feet above ground level. It was stated that interim operation was desired on channel 6 pending permanent allocation and assignment of another channel in lieu of channel 1. It was represented that such a station would not interfere with the Los Angeles station operating on channel 5. This application raised additional questions which had to be con *298 sidered by tbe Commission but plaintiff was assured on February 28, 1949, that the pending boa applications would be considered by the Commission in the near future.
53. On March 25,1949, the eco wrote to bca, the first paragraph of the letter reading as follows:
This is with reference to (1) your construction permit for a television station on Channel 1 (kako) , granted on December 19, 1946 (B5-PCT-30) ; (2) your application for additional time to construct your station, filed on January 12, 1948 (BMPCT-161) ; (8) your application for modification of your construction permit to change your channel assignment from Channel 1 to Channel 13 and main studio location from Riverside to Los Angeles, filed on March 15, 1948 (BMPCT-190); and (4) your application for special temporary authority to operate a television station on Channel 6 at San Bernardino, filed on January 10,1949. These applications, as well as all correspondence and Eapers associated with the files on these matters, have een carefully considered by the Commission and a determination has been reached as to their status and disposition. That determination is based on all the pertinent facts and circumstances connected with said applications, and it is believed that a recital of these matters would be helpful in understanding the basis for the Commission’s decision.
The letter continued for four pages, single spaced, in which the ecc gave exhaustive consideration to the four items set forth in the paragraph above. This letter is in evidence as plaintiff’s exhibit 65. After reciting in outline a chronological development of plaintiff’s contacts with the Commission it was noted that channel 1 had been deleted from the television allocation table on May 6, 1948, after a public hearing on that issue, in which plaintiff elected not to participate although notified thereof. The effect of the deletion of the channel for commercial broadcasting was to cancel the construction permit. Accordingly, the pending application for extension of the permit was denied.
As to point (3) of the letter, the Commission stated that plaintiff was entitled to a hearing on its application for channel 13 in Los Angeles, the same being in conflict with a construction permit already granted to others, as previously noted. Plaintiff was given 30 days to submit a proper re *299 quest for shearing on the issues of objectionable interference, compliance with the eco rules, regulations and standards, public interest, convenience and necessity.[8]
With respect to point (4) of the letter, it was pointed out that hearings had been held on September 7, 11, and 13, 1948, on applications for channel 6, a channel allocated to San Diego, and that plaintiff was not a party in that proceeding and did not ask to be. Accordingly, the application filed by plaintiff in January 1949 for special temporary authority to construct and operate a tv station on channel 6 in San Bernardino was dismissed.
54» On April 19, 1949, boa filed what it described as an amendment to its pending application, requesting authority to construct a one-kilowatt television transmitter in Riverside, to operate on channel 6. No estimate of this station’s cost or of the source of funds for it was included in the application which stated: “On file for all of this section. See file BMPCT-190. No change.”
On May 25, 1949, on the advice of counsel, boa filed a petition for the institution of a rule-making proceeding to assign channel 6 to Riverside. This petition stated that service over such a community station as proposed would be for 57,300 persons in an area of 143 square miles and, within a larger contour, would serve 152,100 persons in an area of 925 square miles. It was admitted that the operation would cause a slight interference with station ktla, channel 5, Los Angeles. It was also pointed out in the accompanying engineering affidavit, that although this station would be closer to San Diego, on the same channel, than was the minimum approved separation in such cases, it was believed that since mountainous terrain intervened no interference should result. The petition continued:
This petition and said application are not filed for the purpose of participating in or affecting the currently pending television allocation proceedings. On the contrary, they are filed subject to those proceedings, as petitioner realizes it is not entitled to a separate rule- *300 making proceeding or the processing of its application prior to a rendition of decision therein. * * *
* * * yonr petitioner prays that this petition be * * * considered in connection with its aforesaid application ; that same be placed in the pending file to await the outcome of the general allocation proceeding, looking toward the amendment of Section 3.606 of the Commission’s Eules; that after the Commission institutes the necessary rule-making proceeding to accomplish the allocation of Channel 6 to Eiverside, California, for use by your petitioner, as proposed in its said application, that this channel be so allocated and that petitioner’s said application for such channel thereafter be duly processed and considered by the Commission.
55. Plaintiff did not accept as a final decision the eco letter of March 25, 1949, referred to in finding 53. It was necessary on June 22, 1949, for the Commission to reiterate the determinations set forth in its March 25 letter and to reaffirm their finality. It was stated further by the Commission:
It is noted that you did not request a hearing with respect to your application to modify your construction permit to change channel assignment and studio location from No. 1 at Eiverside to No. 13 at Los Angeles (BMPCT-190). Accordingly, that application and the application filed by you on April 22,1949, to amend the former to specify Channel 6 at Eiverside are being considered together as a new application to construct a television station on Channel 6 at Eiverside. As such, the new application, together with your petition for amendment of Section 3.606 of the Commission’s Eules and Eegulations, have been placed in the pending files in accordance with the terms of the Commission’s “Eeport and Order” issued on September 30, 1948, a copy of which is enclosed. It should be pointed out that matters placed in the pending files pursuant to that “Eeport and Order” are not being considered at this time either as to substance or form.
The report and order of September 30, 1948, refers to a so-called “freeze” of tv applications under which the eco would act on no more applications for construction permits pending further orders.
56. Plaintiff on December 15, 1949, wrote to the ecc in part as follows:
*301 If the Commission is unable to allocate a channel to us of approximately the equivalent of Channel 1 which was assigned to us in the present 12 channel band, then we would like to have the Commission consider seriously granting us in lieu of Channel 1 for haho, Channel 14 in the ultra-high frequency band, also to keep in mind that we desire to put this television station kaeo at 9100 feet elevation on Cucamonga Peak 20 miles west of the city of San Bernardino and 26 miles east of the city of Los Angeles.
The letter pointed out to the Commission that location of the transmitter on the mountain would interfere with any other station assigned to channel 14 in southern California but asserted that a station of such wide coverage would be of great value in the defense of California in time of emergency.
57. The community of Riverside was assigned two tjhe channels, San Bernardino three, and Los Angeles three in addition to the seven vhe channels previously assigned to the latter location. This action by the ecc was on April 11,1952, in the Commission’s sixth report and order setting forth a detailed statement of all factors considered and the conclusions of the Commission in the matter of assignment of such channels for television use. This report, a document consisting of 702 pages, is in evidence as defendant’s exhibit 32. It disposed of the accumulation of policy problems which had led the Commission to issue the “freeze” order on September 30, 1948. A table of assignment of channels was adopted and the report spelled out in detail why it was in the public interest to adopt such a table. The report referred not only to tjhe but to vhe channels and with respect to the latter contained the following comment:
19. Since the deletion of Channel 1 in 1948 the Commission has allocated 12 channels, Channels 2-13 in the 54-216 me. band, for use by the television broadcast service. The Commission’s Third Notice proposed to continue this allocation.
The report then noted that two parties had filed comments and objections to the fact that the Commission had not provided additional vhe channels. Plaintiff here was not one of those parties. The report continued:
*302 21. In order to allocate additional vhf channels to the television service, it would be necessary to delete frequencies from one or more of the other radio services which have been allocated frequencies in this portion of the radio spectrum. While there is testimony in the record as to the possibility and alleged desirability of such a reallocation of frequencies, this proceeding has included no issue or proposal by the Commission or the parties for the reallocation of specific frequencies nor any evidence evaluating the comparative needs of the various radio services for the pertinent vhf frequencies. Accordingly, this proceeding affords no basis for a decision withdrawing frequencies from other services (both government and non-government) for the purpose of creating additional vhf television channels.
58. The nee sent a telegram to boa on July 17,1952, advising that it was engaged in processing applications for additional channels and that the boa application should be put in proper form for competitive consideration when it was reached. On January 9,1953, bca was notified by the Commission that when its application was reached it was found that it had not been amended in accordance with previous instructions and, not being in proper form nor containing the information necessary for the ecc to consider it, was dismissed.
damages
59. Plaintiff was required pursuant to rule 28 (b) (2) of this court to submit a written statement showing the items and figures intended to be proved with adequate reference to the books and records from which such figures were taken. Plaintiff submitted a schedule and made records available to the Federal Bureau of Investigation for inspection and audit. Plaintiff’s schedule is in evidence as defendant’s exhibits 3 (a) and 3 (b). Plaintiff Gleeson was also interviewed by an fbi auditor. Auditors representing both parties testified. Plaintiff’s claim as scheduled is made up of four principal items. The largest of these is a claim for $6,200,000 for estimated gains that would have been realized by bca had it been granted a license for a tv station. This item is, in turn, broken down into four subsidiary items as follows:
*303 (a) $3,000,000 lost net income for an indeterminate period after August 19, 1947, by which, date plaintiff testified he expected to have finished construction of a tv station and gone on the air with it.
The foregoing sum is an estimate of plaintiff and not subject to audit from any books and records. Plaintiff bases his estimate partly upon alleged earnings of stations enjoying a monopoly in their communities and a news article in the United States News and World Report discussing the income of tv stations in large cities. Plaintiff estimates that a station such as he desired to establish at Riverside would have enjoyed annual average net earnings of at least $500,000. Plaintiff’s consulting engineer places the estimate at $250,000. Plaintiff’s estimate assumes a station of considerably greater power than the one-kilowatt station for which plaintiff received its only construction permit. The estimate is based, also, in part, upon the 1954 earnings of Los Angeles stations which had network affiliations plaintiff did not have. There is no evidence boa would have received such a network contract if it had built a station and later got a license. Boa hoped for a Du Mont connection for tv but lost its radio network connection with abo. As to the Los Angeles stations the evidence establishes that, except for the profit of network stations in 1954, the last year for which figures were available at the trial, both network and nonaffiliated stations in Los Angeles lost vast sums of money from 1948 to 1954, inclusive. This gives validity to an earlier estimate contained in Gleeson’s annual corporate report of January 28,1947, in which he said:
On 12-19-46, the rcc granted to the corporation a television construction permit with call letters kako. The television station will be built during the year 1947 and will likely prove to be a losing proposition for three to five years.
The minutes of the meeting of the boa board of directors on September 19,1949, state:
During discussion of the general financial conditions, the fact was brought out that, due to the teriffic slump in business generally throughout the entire service area of the boa stations, and particularly in the desert area, *304 it became and was necessary, for many months past, to drastically curtail expenses and even to raise capital for general operating expenses.
(b) Plaintiff’s schedule estimates that its prospective tv station would have had a market sales value of $3,000,000. Plaintiff’s testimony puts a value on channel 1 as of August 19, 1947, at one to one and one-half million dollars and by 1955 a value of five to ten million dollars. There is no competent evidence that such would have been the value of any station plaintiff might have built or license he might have received or that plaintiff would have been able to sell it for any price to prospective buyers, none of whom are identified in the record. On the contrary, the evidence establishes that plaintiff was without resources to build a tv station and there is no showing adequate funds were available from other sources.
Plaintiff’s amended petition alleges that the acquisition of a tv station appreciably advances the value of the stock of a corporation and that the increase in value to stockholders of boa by reason of acquisition of channel 1 would have been approximately $8,000,000. It is found that a tv license is valuable to a corporation able to make use of it but that plaintiff’s estimate is entirely speculative.
Plaintiff’s estimate of the cost of a tv station was approximately $750,000 which was considerably less than the average cost of $838,029 for the seven Los Angeles stations. Further, the value of the Los Angeles and other tv stations cannot be related to the prospective value of plaintiff’s prospective station because there is no way in which to compare the management, experience, competitive conditions, and numerous other factors which it would be necessary to establish with competent evidence to draw an effective analogy. The evidence which is in the record establishes that boa’s management was not superior to other tv management, that while the area it primarily sought to serve was a rural one of considerable population there is no satisfactory evidence to show how the profits of such an operation would compare to those of metropolitan stations nearby, that the unstable condition of boa finances made any profit *305 able operation, unlikely, and that it was even more unlikely such a corporation could survive a period of several years of deficit, assuming that its station was built and a license was granted.
One witness offered as an expert by plaintiff testified that if instead of receiving channel 1 the plaintiff had received channel 6, the value being limited to local service, his advice “would be that it wasn’t worth monkeying with * * * they would have lost their shirt.” The estimate of value for channel 4 was $1,000,000 in 1946 and 5 to 10 million dollars by 1955. Channel 13 was valued at about $2,500,000. This witness admitted his estimates were speculative, that he had no firsthand knowledge of tv station profits or sales prices or valuations in the Los Angeles area other than rumor and what he had read in newspapers and magazines. He had made no study of coverage of stations in southern California. He was not familiar with their earnings and admitted that sales prices are affected by these earnings and by how badly someone wants them at the time. He said that there were plenty of people who would pay $10,000,000 for channel 4 in Los Angeles but that it probably wasn’t for sale at any price. None of these prospective buyers was identified. His estimates of value were based in part on what he knew about stations in the eastern and southern part of the country. Plaintiff offered evidence of a radio and television broker who valued channel 1 at $8,000,000, assuming competent management, a location on Cucamonga with rural coverage more than one-kilowatt power, and a network affiliation. His estimate was based on sales prices in Pittsburgh and Philadelphia. The evidence establishes that various tv stations throughout the United States, including the Los Angeles area, have sold, with roc approval, for sums running into millions of dollars, varying in amounts with conditions. Earnings estimated by this witness were in line with plaintiff’s estimates and were speculative.
(c) Plaintiff estimates the value of the Cucamonga Peak site at $100,000. This was federally owned property for which plaintiff obtained a special use permit for a nominal *306 sum as previously noted. A total of $458.34 was paid to the Forest Service for the site. The permit was eventually terminated in 1951 for lack of use. The sum claimed is not substantiated by the evidence.
(d) Plaintiff estimates and claims the sum of $100,000 because “in 1952 the Trustee in Bankruptcy failed to file for increased power for 540 kilocycles.” There is no evidence that this is the fault of the defendant.
60. A second category of costs claimed by plaintiff is composed of $306,276.55 in alleged expenditures to prepare for the addition of television broadcasting to the radio facilities of boa. This item is composed of three parts as follows:
(a) $33,318.40 claimed as the cost of property, plant and equipment expended for television. A portion of this item was referred to in finding 34.
The plaintiff says these expenses were incurred in reliance upon the construction permit and representations of defendant’s agents. Plaintiff alleges a cost of $21,371.57 for a radio station building of which 40 percent was intended to be used for television broadcasting.
The actual expenditures of $21,371.57 for the building were in 1941, 1944, and 1945, and that figure was the value of the building as shown in plaintiff’s books at the end of 1946, less depreciation at that, time, computed by plaintiff at $882.47.
Other items going to make up the total of $33,318.40 include, less salvage value, transmitting equipment at Box Springs Mountain, studio technical equipment, office furniture and equipment, and leasehold improvements at Box Springs and at San Bernardino. These alleged costs are either not substantiated by the evidence or proved to be related to any reliance upon the construction permit of December 1946 or any representations by authorized agents of the defendant. These alleged costs are found to be not related in point of time to affirmative actions of the defendant toward plaintiff in connection with television but, rather, are alleged costs incurred, if at all, upon plaintiff’s own initiative and responsibility and mingled in an inseparable way with costs arising out of plaintiff’s am: and em radio station operations.
*307 SALARIES
(b) $226,429.99 is claimed by plaintiff for the salaries of employees said to have been hired to work in the television station in reliance on alleged representations by defendant that plaintiff would get a channel 1 license, or at least a construction permit for an equivalent station. This claim is contained in schedule A-l to defendant’s exhibit 3 (a). In finding 35 it is established that all of the people employed by plaintiff were employed full time on boa activities other than television, although some of them would have been useful for television had plaintiff not lost his construction permit, had built a station and been granted a license and had been able to operate a tv station. A list of 51 boa employees is in evidence as defendant’s exhibit 3 (a) which is a schedule prepared by plaintiff pursuant to rule 28 (b) (2). There was evidence with respect to each employee. Thirty-one of them testified, 28 as defendant’s witnesses.
Costs claimed under this item commence in the second quarter of 1945 and continue through 1950. It is found that salaries paid prior to issuance of the construction permit for channel 1 on December 19, 1946, are not proper charges against defendant. These salaries total $40,503.25. Three of the individuals named oould not be identified by plaintiff or his chief engineer. Salaries for these three people total $2,266.35. As stated in finding 37, the plaintiff received notice on May 20, 1947, from the eco requesting that boa withhold further action on construction of a station until advised by the Commission, because of the uncertainty about the future of channel 1. However, plaintiff claims salary costs which total $153,260.54 after the start of the next quarter following receipt of the notice. Plaintiff claims these costs oh the theory that in spite of the official notice from the Commission he was entitled to assume he would get a satisfactory channel assigned to him largely by reason of the statement to him by the chairman of the eco as heretofore noted in finding 42. However, these employees, whose wages are now claimed, worked full time for boa radio enterprises. Moreover, there is no evidence that *308 Chairman Denny’s statement, apparently without Commission authority, was intended to bind defendant to grant a permit or license to plaintiff absent any showing by plaintiff and his corporation that there was financial and managerial ability to make proper use of it or without compliance by plaintiff with the rules and regulations of the Commission to which all applicants were subject.
On December 26,1950, plaintiff directed a long letter to the reo and in this letter represented that six people had been hired for tv work. He said attorney James McDowell was hired at $400 per month at a total cost of $20,000 attributable to television. Two engineers, unnamed, were said to have been hired at $400 and $500 per month, respectively, and kept on the payroll for three years for television. One, Jon Hackett, was allegedly hired for sportscasting, Dorothy Day as a fashion expert, Una Steen as a food expert and Forrest Wallace as a program manager. Others were referred to but not named.
The evidence establishes that Mr. McDowell was first employed in 1945 and was on the payroll at the time of the issuance of the construction permit on December 19, 1946. His salary for the next two quarters, which exceeds the period during which plaintiff had unrestricted use of its construction permit, totals $2,100. His salary for succeeding quarters through 1949 was $1,050, $1,050, $1,050, $700, $1,050, $1,050, $1,006.91, $969.24, $1,135.39, $415.37. The salary of Mr. McDowell from the date of his initial employment in 1945 through the fourth quarter of 1949 totals $17,986.91 and there is no evidence that it varied quarterly by reason of any attention he gave to television work for boa and plaintiff. Mr. McDowell was not a witness.
The two engineers referred to in Mr. Gleeson’s letter are not identified by name and cannot be identified on the schedule as fitting the salaries allegedly paid to engineers. Plaintiff’s chief engineer received only $300 per month.
No one named Jon Hackett appears on the schedule. There was a John W. Hacha employed as a sportscaster by boa at its Riverside radio station. He was not employed until the fourth quarter of 1947.
*309 Dorothy Day was not employed until the third quarter of 1948 and Una Steen in the fourth quarter of that year. Plaintiff Gleeson testified that he hired Forrest Wallace in September 1947. He did not show up on the payroll, however, until the first quarter of 1949. He worked only for the first three quarters of that year.
Examination of plaintiff’s schedule of employees, sought to be charged against the expense of preparing for television upon the basis of the construction permit, shows that ten employed in the fourth quarter of 1946, when the permit was granted, were continued on the payroll after the date in May 1947 when plaintiff was told by the ecc to stop work under the permit and all but three were continued on the boa payroll even after May 1948 when channel 1 had been eliminated. They were doing radio work. It has been previously found that plaintiff put three new radio stations on the air in 1946. Whether these ten were employed before or after issuance of the permit in December 1946 is not established but it is shown that they first went on the payroll in the last quarter of that year. However, 28 employees were hired in 1946, the year of plaintiff’s expansion of radio broadcasting stations. Only seven of these were not continued on the payroll into 1948. Some of them continued to work in 1950.
Plaintiff Gleeson claims under this item the sum of $25,425 which, on his schedule, he represents as half of his salary during the period 1946-1950, with the exception of 1949 and the first six months of 1950 where no salary whatever is shown and the last two quarters of 1950 where 25 percent of the total is claimed.[9]
There is in evidence another schedule prepared by plaintiff which shows amounts of payroll checks actually issued to plaintiff for the last hall of 1950 and for 1951. These checks were issued each two weeks in the sum of $170.63 except for the last eight which vary a dollar or two each. The checks total $5,981.63 and, not being cashed by plain *310 tiff, were made a claim by Mm against boa in the bankruptcy proceedings. There is no other documentary evidence to indicate plaintiff’s actual salary for these years. This latter schedule, except for the last half of 1950, in no way supports or verifies the salary amounts claimed by plaintiff in this case. The latter schedule shows actual salary checks issued to plaintiff for the last six months of 1950 total $2,047.56. Plaintiff’s claim, as set forth on Ms schedule prepared for this lawsuit, equals $525 for the same period. As plaintiff says tMs is only 25 percent of his total salary for the six months’ period, Ms total would have been $2,100. Plaintiff attributes only 25 percent of his salary to television in tMs six months’ period and claims nothing for 1951. It will be noted that both years are long after cancellation of the construction permit and final rejection of plaintiff’s application, as described in finding 58.
There is no way on the basis of the evidence to allocate any of the $226,429.99 total claimed under this item to plaintiff’s television activities engaged in as a result of the construction permit or upon ex parte representations of individual fcc members that plaintiff would receive the right to operate a television station on any channel.
OTHER COSTS
(c) The tMrd item of expenditures claimed in tMs category is entitled “other costs” and is set forth in schedule A-3 of defendant’s exhibit 3 (a), prepared by plaintiff. This is a claim for $46,528.16 and contains several items which make up the total. They will be discussed separately.
Plaintiff claims a loss of $1,250 resulting from the foreclosure of Parker Gardens, land identified on his schedule as purchased for “televising natural scenes.” In October 1948 plaintiff entered into a contract to purchase a nursery. He gave checks which total $1,000 to the Security Title Insurance & Guaranty Company of Riverside in December 1948 and February 1949. Under his contract plaintiff was to assume certain deeds of trust to cover the balance due but he defaulted. The $1,000 was forfeited. The plaintiff testified that in addition to the sum above he spent approximately $200 in getting debris off of the nursery property.
*311 Plaintiff claims $3,000 for four trips to Washington, D. C., and $1,500 for two trips for bis attorney, James L. McDowell, at an estimated cost of $750 per trip. The evidence on this is represented principally by a group of checks to Mr. McDowell, who was a company employee, and others made out to certain railroads from 1945 through 1950. The checks are all in differing amounts. There is no competent evidence that they were expenses incurred on account of television or attributable to defendant. There are no book entries relating to these expenses. The checks in evidence total $4,228.90 and not $4,500. Of the sum in evidence, $1,600 represents checks to Mr. McDowell.
Plaintiff’s schedule claims $2,500 as rent for Cucamonga Peak. The rent was $50 per year. From October 6,1941, to December 31, 1950, when plaintiff had a permit for the use of the site in question a total of $458.34 was paid therefor. Plaintiff intended this expenditure to benefit both pm and tv. The balance of the sum claimed is not proved.
Plaintiff’s schedule estimates the cost of tools and trail work at $2,180. At the trial plaintiff reduced this claim to $1,562.92. This sum is reflected by a general ledger account entitled “FM Station — Cucamonga Peak,” which shows postings from May 31,1946, to December 31,1947, and a net balance on the latter date of $1,562.92. What relation this has to television is not established. Plaintiff did intend to use the site for tv as well as pm. Some expenditures for tools and trail work, therefore, would have benefited tv. Plaintiff did not offer any attempt at allocation.
Plaintiff’s schedule claims $3,819.16 for a road survey. Plaintiff’s auditor testified he could not figure out where the information was obtained for this figure. No books or invoices support checks plaintiff represents went for the survey. This matter is not supported by the evidence. Plaintiff claims $1,279 for certain generator costs and transportation. This was in 1950 and 1951. Plaintiff estimates legal fees to P. W. Seward and Abe Stein at $5,000. Seward was employed in 1945 and continued to represent plaintiff until 1953. There is no bill in evidence from either attorney. Mr. Stein’s interest is one contingent upon recovery by plaintiff in this case. The $5,000 is plaintiff’s estimate based on *312 reputed conversations with Mr. Seward to whom he paid $500. Neither attorney presented any claim in connection with boa’s bankruptcy.
Plaintiff estimates a fee of $8,000 due to Plomer Preston, referred to in finding 48. Mr. Preston has not at any time submitted any charges to plaintiff or to the bankruptcy court. There has been no discussion between Preston and plaintiff as to any liability of the latter to the former. There is no proof of Preston’s services.
Plaintiff estimates engineering fees due Glenn Gillett as $18,000. This radio engineer prepared certain applications for plaintiff and made certain surveys both for tv and radio. He submitted a claim in the bankruptcy proceedings in October 1952 in the sum of $10,051.45. What he has recovered by this procedure is not known. It is established that in 1946 he did engineering work relating to Cucamonga for a total charge of $1,564.92 of which $1,500 has been paid. This work was proposed to benefit both tv and em radio. His next charge was for work performed in 1948 in preparing a tv application for karo-tv at a charge of $931.24. Certain amendments thereto were charged at $48.30. There were additional charges for tv amounting to $825.05 in that year. Gillett charged $1,000 for work he did in connection with channel 6 and a rule change in 1949. Total charges possibly attributable to his work for plaintiff’s proposed television operations are $2,586.59.
Of the foregoing items it is found that costs properly allocable to boa’s proposed television operation do not exceed $3,597.22 of the total of $46,528.16 claimed as “other costs.” . There is no satisfactory evidence, however, that these costs are directly attributable to reliance upon representations of the defendant. On the contrary, these costs were incurred at such times and under such circumstances as to indicate they were either promotional in nature and intended to benefit plaintiff’s tv operations if and when plaintiff could make a proper showing to the arco as qualified for a television license. Plaintiff was never able to perfect his finances or applications in such a way as to qualify, nor, with one exception, did he pursue, with requests for formal hearings or rule making, the applications sub *313 mitted. Tbe expenditures for proposed television operations were mingled with expenditures for fm radio and designed to benefit both fm and tv. The evidence does not afford a basis for allocation. However, as expenditures for rent, tools and trail work were intended to benefit both KM and tv, it is found reasonable to allocate them equally between fm and tv and add the tv portion to Gillett’s charges to obtain the $3,597.22 figure above.
61. The third principal item of claim by plaintiff is for “estimated damages to bca from termination of plans for television broadcasting and from operation under title 10 of the bankruptcy act.” This is set forth on a schedule prepared under the rules of this court by plaintiff for use in this case and is in evidence as defendant’s exhibit 8 (a). The total claim for this item is $149,442.82 and it contains five parts which will be discussed separately in the next five findings. This is one of only two items contained in H. R. 5683 referred to this court. The other item was considered in finding 60. All other items in the suit were set forth in the petition and exceed the limitations of the reference but are considered for the convenience of the court and the Congress.
62. Plaintiff claims in its schedule B and B-l the sum of $29,940 for professional services for defending actions of creditors and for preparation of recovery claims. This, sum is comprised of $6,125 said to be due Thomas M. Swear-ingen, a C. P. A. whose employment by plaintiff was in 1953 in connection with the lawsuit. However, he is to be compensated under an agreement with plaintiff which provides for payment to him of two percent of any recovery in the present action in full settlement of his claim for accounting services in connection with it. He prepared the schedules used in the suit by plaintiff. Abe Stein is listed in plaintiff’s schedule for $15,315. Mr. Stein, an attorney, has a contract with plaintiff whereby he is to receive five percent of any recovery up to $455,000 in the present action, in full payment for his services in helping secure passage of a private bill to compensate plaintiff for his alleged losses. Mr. Stein was employed in 1953. The sum of $3,500 is claimed for attorney Robert Shutan who rendered services *314 to bca between June 1952 and June 1953 in connection with chapter x proceedings then pending against that corporation in the bankruptcy court. He submitted a bill for $3,750 plus disbursements of $28.89 to the bankruptcy court, which disallowed it. He has received $400 from plaintiff. $1,000 is claimed for Wright, Peeler and Garrett, attorneys who worked on an unsuccessful plan of reorganization in the bca bankruptcy proceedings. They have submitted no bill for services and plaintiff now agrees their claim should be eliminated from his schedule. $1,000 is claimed for attorney Zach Cobb, deceased. His personal records show a balance of $98.09 due him from plaintiff. $3,000 is claimed for William Shaw, an attorney who rendered services in opposing some 25 creditors’ suits against bca. He has not submitted any bill to plaintiff or to the bankruptcy court. He now estimates the value of his services at $3,500 to $5,000.
63. Plaintiff claims $53,612.96 for “attorneys’ fees and costs, penalties and interest of creditors for actions filed against boa.” This sum, together with the items which comprise it, is set forth in schedule B-2 prepared by plaintiff as its claim and is in evidence as part of defendant’s exhibit 3(a). Plaintiff in his requested finding 42 sets forth this item and the others which make up the total of $149,442.82 under the general heading described in finding 61 hereof. Plaintiff’s requested finding cites his schedules for proof of the claim. Plaintiff does not cite any of the approximately 7,000 pages of record in the case to substantiate the schedules. This record has been carefully examined by the Commissioner; Items which go to make up the claim are in some cases supported by exhibits indicating amounts due to plaintiff or boa. There is no credible evidence to link them to actions of the defendant or its authorized representatives by which plaintiff was misled or caused to incur the liabilities described. The items have been audited by the Federal Bureau of Investigation. They are not found to be proper charges against defendant.
64. Plaintiff claims in schedule B-3 the sum of $15,389.86 in penalties and interest on Federal and State payroll taxes. No connection appears or has been shown between these penalties and interest and the present claim. What was *315 said with, reference to the items in finding 63 is applicable here also.
65. Plaintiff claims in schedule B-4 the sum of $48,250 as the cost of Federal court action in operating boa by trustee. Included in this sum is $6,000 for court costs. .Costs other than fees to the trustee and his attorney were actually $1,462.49. Plaintiff estimates that the trustee incurred a fee of $12,500. The fee was $12,189.49 for one trustee and $2,000 for another. The attorney was allowed a fee of $15,073 by the bankruptcy court instead of $20,000 alleged by plaintiff. A sum is also claimed for the trustee’s station manager. The actual costs of bankruptcy through July 31, 1954, were $49,233.10. There is no connection established between these items and costs and the present claim other than plaintiff’s allegation that defendant caused bankruptcy of boa. What has been said in finding 63' applies here also.
66. As the final item under the general heading described in finding 61, plaintiff claims in schedule B-5 the sum of $2,250 in costs for expenses allegedly incurred on three trips to Washington in connection with his attempt to secure relief from Congress. These alleged trips were in 1953. What has been said in finding 63 is applicable here also.
67. The fourth and final major item of claim set forth on plaintiff’s schedules in evidence as defendant’s exhibits 3 (a) and 3 (b) is the sum of $242,773.57 for “Damages Incurred by W. L. Gleeson.” By reference to schedule C of defendant’s exhibit 3 (a) it will be seen that plaintiff sets forth three principal items which comprise the total figure stated. Succeeding schedules break down these subtotals as follows:
(a) Plaintiff, in schedule C-l, claims $173,236.85 as his investment in boa. Of this sum $49,900 allegedly represents investment in boa capital stock and $123,336.85 in advances to boa secured by a deed of trust dated September 21, 1949. Plaintiff actually invested $12,600 in 1941 in 126 shares of boa stock. Plaintiff paid $8,000 to a minority stockholder in 1949 on a contract to purchase 124 shares of boa stock and still owed $25,000. However, plaintiff testified that he had a contract to purchase this stock for $60,000 and that the seller got a judgment against him for $40,000 representing the unpaid balance. Plaintiff had a stipulation, however, *316 under which he could satisfy the judgment by payment of $25,000 within one year from the date thereof, December 29, 1953. This schedule includes $2,000 in alleged attorney fees. Plaintiff indicated that he had resold five of the shares for $5,000.
(b) Plaintiff and his wife made many advances to boa over the years and by September 21,1949, the sum amounted to $90,762.60. At a meeting of the boa board of directors on that date, a quorum being plaintiff and his wife, it was voted to take the note of boa for this amount, secured by a second deed of trust on certain of its properties. Of this sum, $24,500 represented accumulated unpaid salary and $66,262.60 advancements made. The minutes describe the necessity for these advances by plaintiff as arising from “the terrific slump in business generally throughout the entire service area of boa stations, and particularly in the desert area. * * *” The difference between the $90,762.60 and the $123,336.85 claimed by plaintiff represents advances allegedly made after September 21,1949. Plaintiff made a claim for the total sum in bankruptcy court but it was not allowed.
68. As part of his claim for personal damages plaintiff seeks $44,536.72 as set forth in his schedule C-2. The first item in this element of the claim is for $31,100 for “advances.” At the trial plaintiff reduced this figure to $21,332.66. The evidence offered to support this figure consists of numerous canceled checks for the years 1946 through 1950, mostly in the latter year. Some of the checks are made out to the boa radio stations by plaintiff. One check for $2,000 is made out to the fm station in March 1950. Some checks are made out to employees and others to magazines, a tax collector, a water company, insurance companies, oil companies, to various unidentified people and for unknown purposes. Plaintiff did not describe the purposes of these checks as they relate to his television enterprise nor. did he make them available for audit by the fbi pursuant 'to order of the court. There are no record books, check stubs or invoices which throw any light on these expenditures.
Plaintiff, in addition, claims $13,436.72 in expenditures for presenting claims to the Committee on the Judiciary of the United States House of Representatives and to protest *317 bankruptcy proceedings. $1,261.59 of the $13,436.72 is said to represent travel expenses, largely for trips to Los Angeles and San Francisco in 1953. $1,517.07 is listed by plaintiff for supplies, public stenographers and other expenses in 1953 and 1954. A set of law books is included. There were duplications and plaintiff reduced the amount claimed under this item by $120. Plaintiff claims $253.06 for telephone expenses. $68.06 is now the verified amount. These are long distance telephone charges and to whom and for what the calls were made is not established, nor is there any evidence as to what year these calls were made. Plaintiff claims $2,450 for legal fees paid. The evidence supports an expenditure of $175 for legal fees in 1952 and 1953. These expenses appear to have been in connection with the boa bankruptcy proceedings. Plaintiff claims $4,190 for engineering fees and offered evidence in the form of canceled checks totaling $4,100 claimed by plaintiff to have been for this purpose but otherwise unverified. Plaintiff claims $3,765 on his schedule as representing certain proceeds appropriated by the bankruptcy court but withdrew this item of claim at the trial.
69. Schedule C-3 is plaintiff’s final schedule in evidence, defendant’s exhibit 3 (a), and claims $25,000 for the personal services of plaintiff. $12,000 is claimed for each of the years 1952 and 1953 and $1,000 for January 1954. Plaintiff represents that this compensation is claimed at the rate of two-thirds of his rate of salary when employed by the corporation because he devoted two-thirds of his time to the television matters in the years claimed. There is no evidence of what bca actually paid plaintiff for the period claimed, if anything. In finding 60 it is shown that in 1951 his actual salary was at the rate of approximately $170 each two weeks and that his entire salary for the last half of 1950 and for all of 1951 totaled only $5,981.63.
70. II. E. 5683, referred to this court by H. Ees. 284, described in findings 1 and 2, sets plaintiff’s alleged damages at a total of $455,719.37. An earlier bill, H. E. 1693, used the figure of $149,401.79. When plaintiff filed his petition the amount was raised to $6,178,442.82 for Mr. Gleeson personally and $6,656,719.37 for bca, for a total of $12,835,- *318 162.19.[10] Tlie plaintiff’s amended petition joined in by the trustee as intervenor raised the figure claimed to $13,455,-719.37, of which the intervenor claimed $3,306,276.55. Plaintiff’s schedules filed pursuant to order of the court for audit by defendant claimed $6,898,492.94. Of the total claimed by plaintiff’s amended petition $8,000,000 is alleged to represent damages for loss of television and $455,719.37 for “other losses of funds and obligations incurred.” The latter figure is the sum of $306,276.55 for expenses and $149,442.82 for damages set forth in H. P. 5683. The additional sum of $5,000,000 is claimed for loss of pm (frequency modulation) radio. This station was not mentioned in the bill referred to this court but was set up in the pleadings as an element of damage as described above. Plaintiff alleges that deletion of channel 1 resulted in the cancellation of the bca permit for' construction of both the pm and proposed tv transmitter on Cucamonga Peak and caused the damage stated. Plaintiff further alleges that the acquisition of an pm station appreciably advances the value of the stock of the corporation holding it and that $5,000,000 was the value of the pm station to bca stockholders.
Plaintiff offered testimony that the pm station, erected on Cucamonga, would have been an asset earning from $100,000 to $1,000,000 per year and would have cost $250,000 to $500,000 to establish. It was further estimated that its sales price at the date of construction would have been the cost thereof but that by 1955 would have been from $2,500,000 to $5,000,000. All of these estimates assume that the pm channel would have been used for services other than pm broadcasting. There is no evidence that the pcc would have permitted this. It was being done on an experimental basis. The station was established, as heretofore shown, and did operate but failed. It did not offer the other services contemplated by plaintiff. The fact that the station was not located on Cucamonga Peak is found to be no fault of de *319 fendant. Had it been as profitable as plaintiff estimates, it could have been so located and doubtless would have solved plaintiff’s financial problems. The decision not to erect the station on Cucamonga was plaintiff’s. The foc granted every request made by plaintiff and boa with respect to the fm station. The record contains no competent or credible evidence to establish that any of the alleged losses flowed from actions of the fco with respect to the fm operation or that any of the fm losses were the result of any action by the fco with respect to the tv applications or cancellation of channel 1. Plaintiff’s estimates of the value of the fm station at the time of the trial differed considerably from his estimate of its value at the time of the issuance of the fm construction permit. In plaintiff’s annual corporate report of January 29, 1946, for the year 1945 he stated:
The Corporation has been granted a construction permit by the fco to build an fm station on Cucamonga Peak, twenty-six miles northwest of Riverside. Construction of this fm normally would have to get under way within ninety days from the date it was granted, but the building of the station holds great risk to the corporation; and in fact, should the corporation build an fm station at this time, with no sets available to receive the programs, it would practically double the operating costs of the corporation, with no possible revenue returns therefrom for at least three more years. So I recommend that the construction permit be sold for whatever we can get out of it, if possible.
There is no evidence that plaintiff or boa was able to sell this permit for any price.
71. Plaintiff has an arrangement with Abe Stein, the attorney who represented him before Congress in connection with passage of a private bill, to compensate him for his alleged losses. Mr. Stein is to receive five percent of any recovery not in excess of $455,719.37, the sum of the two amounts stated in H. It. 5683, 83d Congress, 1st Session, quoted in finding 2. Thomas Swearingen, the accountant who prepared the various schedules for plaintiff in this case, is to receive two percent of any recovery. These facts have been previously recited. In addition, Morris Lavine, the attorney who represented plaintiff in the present action and who likewise appeared as special counsel for the trustee in *320 bankruptcy of boa, is to receive ten percent of any recovery as a result of this action, less the sums paid to the two individuals named above. The court, on November 21, 1956, allowed his motion for leave to withdraw as counsel. Thomas S. Tobin, the attorney for the trustee in bankruptcy of boa, has no contractual arrangement with plaintiff which is in evidence.
ultimate FINDING
72. The allegations of plaintiff’s amended petition which plaintiff uses as the basis of his claim may be summarized as follows:
Plaintiff was the principal owner of the Broadcasting Corporation of America which on December 19, 1946, was issued a construction permit by the Federal Communications Commission, for a new television statiqn, haro, to operate on channel 1 with a transmitter on Cucamonga Peak, San Bernardino County, California, and a studio location in Riverside. In reliance upon this permit plaintiff expended $306,276.55 toward the erection of said station. On May 20, 1947, plaintiff received a letter from the fcc, dated May 14, the effect of which was to suspend the construction permit by directing plaintiff to withhold all further action on construction until allocation problems were worked out at a World Telecommunications Conference in October. Defendant knew when the permit was issued that these problems existed. ■ Channel 1 was deleted and turned over to fixed and mobile services. Defendant repeatedly promised to give plaintiff another channel but did not. No other vhf channel is now available. In reliance upon the permit and these promises plaintiff expended great sums of money as set forth in his schedules in evidence and suffered damages and is entitled to $13,455,719.37 from the defendant, of which $3,306,276.55 was asked for the'now withdrawn intervenor (trustee in bankruptcy for bca) .
Findings of fact with reference to the foregoing allegations have been made in detail. They may be summarized as follows:
Plaintiff first made incomplete applications for channels 3 and 4 but as these were allocated elsewhere he authorized the fco to select a channel for him. He accepted channel 1. *321 A construction permit was issued on December 19, 1946. This was not a license to broadcast. The ecc, in the permit, reserved the right to cancel or modify any tests made under it. Plaintiff signed a waiver in applying for the permit. This waiver applied to any claim for the use of any frequency against the regulatory power of the United States, because of the use of the frequency, whether by license or otherwise. Defendant knew at the time the construction permit was issued that there were interference problems in the channels because they were being shared, but there is no evidence that the eco thought this would require deletion of a channel. This interference was in all of the channels except channel 6. The permit was suspended on May 20, 1947, in order to solve these interference problems. On May 5, 1948, without appearance or formal protest from plaintiff and after public hearings, of which plaintiff had notice, channel 1 was deleted. The fcc stated that the action was in the interest of the public welfare and national security and that the channel would be given to the fixed and mobile services engaged in safety and protective activities. The other channels were left clear. These other channels were previously allocated. No official promise was ever made by defendant to plaintiff that plaintiff would receive any channel in lieu of channel 1. The eco chairman at a convention and social gathering, in a statement not shown to have been authorized by the Commission, promised plaintiff another channel and efforts were made to find him another. Plaintiff, however, did not perfect his applications for other channels although he made several on behalf of boa. Plaintiff and his corporation, boa, at no time demonstrated the required financial condition to qualify for a television license or construction permit or to operate successfully under the same. Plaintiff’s representations to the eco which resulted in a construction permit for channel 1, were misleading. Plaintiff’s cost estimates for construction of a station on the various channels he sought were lower than the facts show such stations cost and plaintiff’s financial resources and condition and those of boa were unstable and inadequate for such a venture. Plaintiff has argued that the issuance of a permit was of such value that it would immediately attract the necessary capital. How *322 ever, the fact is that it did not. Plaintiff, prior to suit, had correctly described such a permit as a conditional authority of no monetary value. Plaintiff has blamed the bankruptcy of boa on defendant’s treatment of its television applications. However, the record shows admissions of plaintiff made prior to suit that the boa financial troubles were due to general economic conditions in its service area. Plaintiff has alleged that sums of money were spent which were not spent. Plaintiff has claimed that people were hired who were not hired nor retained as a result of defendant’s actions. Plaintiff blames all of his losses and those of bca on defendant but the facts are that most, if not all, of those losses arose from plaintiff’s other activities. Plaintiff’s intermingling of these losses with those respecting television casts serious doubt on the credibility of plaintiff’s evidence with respect to television losses, if any, and vitiates any possibile equities in his favor. Allocation of these losses is not possible. Many of them are entirely anticipatory and speculative and others clearly not attributable to action of defendant.

 The next reference to the jm station development is in finding 36, following a chronological development of the 'rv and I’M projects in these findings.

 The figures given by the trustee In bankruptcy differ from those given by plaintiff's auditor for the condition of bca in X945 and 1946, indicating a larger profit for those two years. The trustee’s testimony showed an average profit for the years 1941 — 1946, inclusive, of $21,028.74. In 1947 the corporation started losing money and continued to do so through 1961. Its total loss for those five years waB $197,560.07, an average of $16,463.34 per year. When the trustee took over management of bca affairs on January 14, 1952, the corporation had only $489 in the bank and liabilities in excess of $400,000, and had lost its credit standing, under management of the trustee bca has shown a profit in each successive year.

 Plaintiff’s schedule in evidence makes a claim for the salaries of 51 persons including plaintiff. See finding 60 (b).

 Plaintiff’s radio stations were kpro, Riverside ; kreo, Indio krop, Brawley; and kxor, Blythe, kpob, Riverside, was the pm station and karo was the proposed tv station.

 Plaintiff’s annual report to the fcc shows a net loss of $7,496.

 The items total $1,000 less than the application states.

 Plaintiff testified to tie committee considering H. R. 1693 that If these funds were spent by Mrs. Thackrey the fcc had no alternative but to extend her permit. He did not have knowledge of these expenditures prior to 1952.

 The fog minutes for March 24, 1949, note that “Commissioner Hyde requested that the Commission exhaust every possible means of finding an assignment that -will in some measure replace Channel One which was deleted after the grant of a permit to Broadcasting Corporation of America.”

 The schedule claims a fuU salary for the fourth quarter of 1946 which Is assumed to be an Inadvertent error as the same dollar amount Is claimed for this quarter as In the two preceding quarters which are Indicated to be 50 percent of the total salary. Further, plaintiff’s schedule represents that his salary for 1946 and 1948 was less by $1,950 and $1,750, respectively, than represented by his annual reports filed with the rcc.

 In his testimony on H. R. 1693 before the House Committee on the Judiciary, March 9, 1953, at which time plaintiff sought direct relief from Congress, he said: “I also would be entitled to some profits on the station, the television station, had we been granted it and completed it in 1947. That, of course, we waive. I am not interested in getting compensation from uncle Sam. I am not interested in getting extra money.” Plaintiff’s claim for lost anticipated profits as -presented to the court is set forth in Binding 59.